RDT Construction Corporation y Rubén Tresgallo, demandantes y recurridos, *v.* Ileana M. Colón Carlo, Contralor del Estado Libre Asociado de Puerto Rico, demandada y recurrente.

*Número:* RE-94-15 *Resuelto:* 28 de agosto de 1996

*José Hamid Rivera*, abogado de la parte recurrente; *Rafael Ocasio Rivera* y *Alejandro Carrasco Castillo*, abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante un recurso de revisión, comparece ante nos la Contralora del Estado Libre Asociado de Puerto Rico, Hon. Ileana M. Colón Carlo, y nos solicita la revocación de una sentencia del entonces Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), que decretó irrazonable e ilegal un *sub poena* emitido por su Oficina contra el Banco Santander para que le entregara una copia de las cuentas bancarias de una corporación privada y de su accionista principal. La referida empresa estaba siendo investigada por el uso de fondos públicos para la construcción de una obra gubernamental, que debía realizar en virtud de un contrato otorgado con la Compañía de Fomento Recreativo. El tribunal a quo concluyó que tanto los accionistas como la corporación tenían una expectativa razonable de intimidad sobre los documentos en poder del banco, y que era necesario una orden judicial previa para que el *sub poena* fuera válido.

Aunque reconocemos que existe una expectativa de intimidad sobre la información que las instituciones bancarias poseen sobre sus clientes y que, por lo tanto, los demandantes en el caso de autos gozaban de acción legitimada para cuestionar la validez de la citación formal; revocamos el dictamen recurrido por entender que según las circunstancias específicas de este caso, el *subpoena* emitido por la Contralora fue razonable.

I

A finales de 1991, como parte de una auditoría de la Compañía de Fomento Recreativo que realizaba la Oficina del Contralor, se inició la investigación de un contrato que dicha Compañía suscribió con RDT Construction Corp. (en

adelante RDT) para construir el "Pabellón de la Paz" en el Parque Luis Muñoz Rivera, en San Juan. Con estos propósitos, la Contralora expidió varias citaciones formales al Banco Santander para la producción de cierta evidencia documental (*sub poena duces tecum*) sobre las cuentas bancarias tanto de RDT como de su presidente y único accionista, el Sr. Rubén Tresgallo. También se solicitaron las cuentas de Rutsa Construction Corporation, otra empresa controlada por Tresgallo y su hijo, Henry Tresgallo, quienes no han comparecido en este caso. Ni los Tresgallo ni RDT ni Rutsa Construction Corporation fueron notificados por la Contralora del requerimiento de documentos.

En particular, se requirió la entrega de copias de los estados bancarios, depósitos y cheques de RDT, de Rubén Tresgallo, de Henry Tresgallo y de Rutsa Construction Corporation para el período desde el 1ro de enero de 1988 hasta el 31 de diciembre de 1992. El Banco Santander cumplió con el requerimiento, sin objeción, y entregó los documentos solicitados por la Oficina del Contralor. El Banco no notificó a los depositantes sobre el *sub poena* recibido ni de la entrega de los documentos.

Posteriormente, como parte del procedimiento investigativo, Rubén Tresgallo fue citado a una audiencia en la Oficina del Contralor para darle una oportunidad de replicar los hallazgos de la investigación.[1] Enterados de la investigación, RDT y Rubén Tresgallo solicitaron del Tribunal de Primera Instancia, Sala Superior de San Juan, que mediante una orden de entredicho provisional se impidiera el uso de los documentos obtenidos del Banco Santander por controvertir su derecho constitucional contra registros y allanamientos irrazonables. En su petición sostuvieron que la Contralora carecía de autoridad en ley para realizar este tipo de registro de sus cuentas bancarias sin su con-

---

[1] La Oficina del Contralor citó a Rubén Tresgallo para que compareciera a su oficina y declarara con relación a la investigación. En dicha comparecencia el señor Tresgallo, luego de prestar una declaración jurada según solicitado por la Contralora, rehusó firmarla.

sentimiento y sin mediar una orden judicial, según lo resuelto en *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945 (1993). El foro de instancia denegó la petición y ordenó que se emplazara a la Oficina del Contralor para continuar el trámite del caso por la vía ordinaria.

Por su parte, la Contralora solicitó que se dictara una sentencia sumaria contra los demandantes. Alegó que tenía la facultad para investigar a los demandantes y que éstos carecían de expectativa razonable de intimidad sobre los documentos en posesión del Banco Santander. Los demandantes, por su parte, se opusieron a la solicitud de sentencia sumaria y argumentaron que poseían una expectativa razonable de intimidad sobre los documentos en cuestión.

Oportunamente, el ilustrado Tribunal Superior concluyó que el peticionario tenía una expectativa de intimidad sobre las cuentas y los expedientes bancarios, y que la Contralora estaba obligada por la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico "a obtener una orden para el registro de los récords bancarios de los demandantes". Sentencia de 30 de noviembre de 1993, pág. 13. Dicho foro también explicó que en su comparecencia la Contralora no demostró que "el obtener una orden *ex-parte, H.M.C.A., supra*, de un tribunal hubiera operado en detrimento de la intervención que realizó". Íd.

Por ende, el tribunal a quo dictó sentencia en la que decretó como irrazonable e ilegal el registro de las cuentas bancarias y ordenó la devolución de los documentos. Además, prohibió que dichos documentos fueran utilizados como parte de la auditoría practicada a la Compañía de Fomento Recreativo. Inconforme con dicho dictamen, recurre ante nos la Contralora y argumenta que los demandantes carecen de expectativa razonable de intimidad sobre los documentos bancarios en cuestión y que, por lo tanto, no se efectuó un "registro" que active la protección constitu-

cional. Además, expone que al momento de llevarse a cabo la investigación no se había decidido el caso de *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, y las citaciones fueron emitidas de acuerdo con la normativa vigente.

Por otro lado, señala que la decisión del Tribunal Superior impone unos requisitos adicionales a los establecidos en *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, que limitan el poder investigativo del Contralor. Sostiene que la norma establecida en *H.M.C.A.* "protege adecuadamente los intereses en conflicto en este tipo de investigaciones, puesto que la información contenida en esos r[é]cords bancarios no es más importante, ni más sensitiva, que la que ordinariamente se encuentra en la documentación que puede obtener la recurrente mediante el sistema de órdenes judiciales ex-parte establecido en *HMCA*". Recurso de revisión, pág. 19. Por último, solicita que si se concluye que existe una expectativa razonable de intimidad sobre las cuentas bancarias, no se deben imponer requisitos adicionales a los establecidos en *H.M.C.A.*, supra.

## II

En Puerto Rico, el Contralor es un funcionario de rango constitucional con amplias facultades investigativas para fiscalizar "todos los ingresos, cuentas y desembolsos del Estado, de sus agencias e instrumentalidades y de los municipios, para determinar si se han hecho de acuerdo con la ley". Art. III, Sec. 22, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 347. "Su misión consiste en realizar una intervención a posteriori (*post audit*) de las cuentas, ingresos y desembolsos del gobierno para determinar su *legalidad.*" (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2588 (1951). Estas facultades están constitucionalmente circunscritas a investigar e informar sobre la legalidad del gasto de fondos públicos en

que ha incurrido cualquier entidad del Estado o sus agentes.

■ En *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, resolvimos que el poder investigativo del Contralor se extiende sobre las entidades privadas que contratan obras o servicios con el Estado. Dicho funcionario posee autoridad constitucional para ejercer su poder investigativo sobre personas privadas si ello es necesario para poder cumplir con su función de investigar y fiscalizar la legalidad de los desembolsos de fondos y de propiedades públicas que sean efectuados por las agencias o instrumentalidades del Estado. Ello implica que, en el curso de una investigación, el Contralor podrá requerir la información pertinente y razonable de entidades privadas para esclarecer si los desembolsos fueron efectuados de acuerdo con la ley y con los reglamentos aplicables. *H.M.C.A.*, supra.

Esta facultad investigativa tiene particular vigencia en esta época en que el Estado con frecuencia contrata con entidades privadas para que éstas presten servicios, que antes proveía directamente el Gobierno. Ante esta realidad, el mandato constitucional exige que estas empresas o personas privadas, que reciben desembolsos de fondos gubernamentales, no queden al margen del ámbito fiscalizador del Contralor. Por ello, al investigar la legalidad de los desembolsos gubernamentales a personas privadas para la realización de obras o de servicios públicos, el Contralor cumple con su encomienda constitucional.

■ Como parte de su función investigativa, el Contralor tiene poder para emitir citaciones formales o *sub poenas* para la comparecencia de testigos y para requerir la producción de documentos. La propia Constitución en su Art. III, Sec. 22, *supra*, pág. 348, establece la base legal del poder de *sub poena* del Contralor al disponer que:

En el desempeño de sus deberes el Contralor estará autorizado para tomar juramentos y declaraciones y para obligar,

bajo apercibimiento de desacato, a la comparecencia de testigos y a la producción de libros, cartas, documentos, papeles, expedientes, y todos los demás objetos que sean necesarios para un completo conocimiento del asunto bajo investigación.

■ Sin embargo, hemos aclarado que este poder investigativo del Contralor, aunque amplio, "no queda al margen de los postulados constitucionales que informan nuestro ordenamiento". *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, pág. 969. En nuestro ordenamiento constitucional, la razonabilidad de un requerimiento de documentos emitido por el Contralor mediante *sub poena (sub poena duces tecum)* depende de que la investigación que se lleve a cabo esté dentro de la autoridad conferida por la ley; que el requerimiento no sea demasiado indefinido, y que la información solicitada sea razonablemente pertinente al asunto específico bajo investigación. *H.M.C.A.*, supra.

Por supuesto, la jurisprudencia ha establecido distinciones entre los métodos investigativos para efectos de determinar la razonabilidad de la intervención. De ese modo, se han aplicado distintos criterios dependiendo, por ejemplo, si se trata de allanamiento de hogares o negocios; de inspecciones administrativas de establecimientos comerciales, o si la investigación está limitada a la entrega de documentos. Véanse: *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984); *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra.

El caso de autos se trata exclusivamente de un requerimiento de documentos que emitió la Contralora, en virtud de su poder de *sub poena*. En este aspecto, el caso de autos es distinguible de *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, en el cual el método investigativo impugnado fue esencialmente un registro y allanamiento de las oficinas de una corporación. En aquel caso, la Contralora ordenaba en la citación formal que se le permitiera el acceso a las oficinas de la corporación investigada para allí inspeccionar y reproducir "cualquier" documento relacionado que sus au-

ditores " 'estim[ara]n pertinentes para un completo conocimiento del asunto bajo investigación' ". *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, pág. 954. Mediante dicha orden, la Contralora pretendía entrar a las oficinas de H.M.C.A. para registrar los expedientes y seleccionar aquellos pertinentes a la investigación realizada. Por su naturaleza, esa investigación era un registro de un establecimiento que requería una orden judicial previa.

En el caso de autos, el *sub poena* de la Oficina del Contralor requería la producción de unos documentos bancarios particulares. La controversia medular se circunscribe a determinar si el *sub poena* emitido por la Contralora contra el Banco Santander para que entregara copias sobre ciertas cuentas de RDT y cuentas personales del accionista principal de dicha empresa, violó la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Para ello, debemos resolver si el requerimiento de los documentos relacionados a las cuentas de los demandantes recurridos constituyó una intervención irrazonable dentro del ámbito de intimidad protegido por nuestra Constitución.

■ En el caso particular de la corporación demandante, RDT, reconocemos que le cobija la protección del Art. II, Sec. 10 de nuestra Constitución, *supra*. En *E.L.A. v. Coca Cola Bott. Co.*, supra, expresamente reconocimos que la normativa consagrada en el Art. II, Sec. 10 de la Constitución de Puerto Rico, *supra*, se extiende también a corporaciones privadas: "Las corporaciones están protegidas por las disposiciones de la Cuarta Enmienda." *Hale v. Henkel*, 201 U.S. 43 (1906); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920); *Go-Barth Co. v. United States*, 282 U.S. 344 (1931). No obstante, tanto en Puerto Rico como en Estados Unidos se ha reconocido que el ámbito de la intimidad, protegido por dicha disposición constitucional, es mayor en las personas naturales que en las

corporaciones. Véanse: *E.L.A. v. Coca Cola. Bott. Co.*, supra; *United States v. Morton Salt Co.*, 338 U.S. 632 (1950).

Para resolver la controversia planteada debemos primero examinar una cuestión de umbral: si las personas poseen un derecho de intimidad sobre la información que sobre su vida privada, sus transacciones y sus negocios tengan las instituciones bancarias. Además, debemos determinar si las corporaciones pueden reclamar este derecho. De lo anterior depende si los demandantes poseen legitimación activa para impugnar el requerimiento de documentos (*subpoena duces tecum*) que en el caso de autos emitiera la Contralora al Banco Santander.

La controversia en este caso se examina a continuación exclusivamente al amparo del Art. II, Sec. 10 de la Constitución de Puerto Rico, *supra*. Por ende, las referencias a casos y artículos estadounidenses en el curso de esta opinión se hacen únicamente para fines comparativos, o cuando se trata de referencia a las decisiones del Tribunal Supremo de Estados Unidos para describir el contenido mínimo de nuestra protección constitucional.

## III

La Cuarta Enmienda a la Constitución de Estados Unidos protege a los ciudadanos contra registros, allanamientos e incautaciones irrazonables. Dicha disposición establece el alcance mínimo de la protección homóloga contenida en el Art. II, Sec. 10 de la Constitución de Puerto Rico, *supra*. Para determinar si una investigación constituye un registro según la Cuarta Enmienda, dos (2) enfoques han prevalecido en la jurisprudencia norteamericana a través del tiempo: el criterio de "posesión o propiedad" y el de "expectativa razonable de intimidad". Nota, *Government Access to Bank Records*, 83 Yale L.J. 1439 (1974).

Previo a 1967, el criterio aplicable era el de "posesión o propiedad". *Alderman v. United States*, 394 U.S. 165,

176–177 (1969); *Jones v. United States*, 362 U.S. 257 (1960); *Mancusi v. DeForte*, 392 U.S. 364 (1968). Al amparo de esta norma, la persona que alegaba una violación de su derecho según la Cuarta Enmienda debía demostrar que tenía un derecho propietario o la posesión efectiva sobre la cosa o el lugar registrado.

Sin embargo, a partir de la decisión del Tribunal Supremo federal en *Katz v. United States*, 389 U.S. 347 (1967), dicho Foro varió el enfoque hasta entonces predominante. Recalcó allí el Tribunal que la garantía constitucional provista por la Enmienda Cuarta tenía el propósito de proteger a las personas y no a los lugares, por lo que restó importancia a la antigua doctrina que exigía la entrada ilegal al lugar que habría de ser registrado. La norma formulada por primera vez en dicho caso, y la que se convirtió en el criterio rector en casos subsiguientes, fue expuesta con elocuencia por el Juez Asociado Harlan en su opinión concurrente:

> ... My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable". *Katz v. United States*, supra, pág. 361.

■ Es decir que, para determinar si la actuación del Estado constituye un registro a los efectos de la Cuarta Enmienda, es necesario determinar si la persona afectada alberga una expectativa de intimidad sobre el lugar o artículo que habrá de ser registrado y si tal expectativa es razonable a la luz de los criterios prevalecientes en la sociedad. *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *California v. Ciraolo*, 476 U.S. 207, 211 (1986). Véase, además, E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, pág. 345.

La determinación de la razonabilidad de la expectativa,

según decisiones posteriores de dicho Tribunal, consiste en dictaminar si la intrusión gubernamental viola un valor personal reconocido socialmente y protegido por la Cuarta Enmienda. *Oliver v. United States*, 466 U.S. 170, 181–183 (1984); *California v. Ciraolo*, supra, pág. 211.

■ En *United States v. Miller*, 425 U.S. 435 (1976), el Tribunal Supremo federal pareció dar marcha atrás a la doctrina prevaleciente sobre "expectativa razonable de intimidad" sobre los documentos bancarios de los depositantes.([2]) Sin embargo, esta decisión federal ha sido muy criticada por la literatura erudita por ser totalmente incompatible con los criterios formulados en *Katz v. United States*, supra, y con los propósitos de la Cuarta Enmienda. En su conocido tratado sobre la Cuarta Enmienda, el profesor La Fave señala lo siguiente:

> The result reached in *Miller* is dead wrong, and the Court's woefully inadequate reasoning does great violence to the theory of Fourth Amendment protection which the Court had developed in *Katz*. A bank depositor's informational control over his financial transactions "deserves Fourth Amendment protection surely as much as occupancy of telephone booths." Especially "[i]n light of the massive recordkeeping of personal financial transactions, unrestricted government access to bank records poses a severe threat to civil liberties and privacy." But *Miller* holds that this access is not at all restricted by the Fourth Amendment, and thus it is unquestionably true that this case has "a substantial adverse impact upon values the Fourth Amendment seeks to preserve."
>
> . . . . . . . .
>
> *Miller* by resorting to a "propietary interest" interpretation which seemingly had been abandoned in *Katz*, fails to give protection to information which surely deserves to be characterized as private. (Escolios omitidos.) W.R. La Fave, *Search and*

---

([2]) Ante un reclamo de que cierta investigación de cuentas bancarias realizada por el *Internal Revenue Service* mediante una citación supuestamente defectuosa violentaba los derechos del acusado bajo la Cuarta Enmienda, el Tribunal Supremo federal determinó que los depositantes en cuentas bancarias no tienen una expectativa razonable de intimidad sobre los documentos bancarios que reflejan sus transacciones. Véase *United States v. Miller*, 425 U.S. 435 (1976).

*Seizure, A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., Sec. 2.7(c), págs. 511–512.

La doctrina imperante en Estados Unidos sostiene que, desde su origen, la Cuarta Enmienda tenía el propósito de proteger el derecho de intimidad en el sentido del control sobre la información privada. Aunque cuando se redactó la Constitución ese control se lograba manteniendo las cosas en sus hogares o bajo su posesión inmediata, con los años y los cambios tecnológicos esa información ahora se guarda en otros lugares, incluso en los archivos de las instituciones bancarias.

Las instituciones bancarias tradicionalmente han considerado que los datos sobre las transacciones de cheques de los depositantes son confidenciales y los clientes tienen una expectativa legítima de que no se divulgará dicha información a terceros sin su consentimiento. Esta práctica responde no sólo a las costumbres bancarias, sino también a las obligaciones impuestas por la legislación federal, que requiere que los bancos conserven por varios años la información sobre las cuentas de sus clientes. Nota, *supra*, pág. 1464. Véanse, además: W.J. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977); J.R. Mangan, *Reasonable Expectations of Privacy in Bank Records: A Reappraisal of United States v. Miller and Bank Depositor Privacy Rights*, 72 J.Crim. L. & Criminology 243 (1981).

Conscientes de las críticas a los fundamentos de *United States v. Miller*, supra, y de los derechos concedidos por la legislación del Congreso en respuesta a esa decisión,[3] muchos Tribunales Supremos estatales han recha-

---

[3] Después de la decisión *United States v. Miller*, supra, el Congreso de Estados Unidos aprobó la ley conocida como *Right to Financial Privacy Act*, 12 U.S.C. secs. 3401–3422 (Supl. III y IV 1979-1980). Este estatuto otorga a los individuos muchas de las protecciones denegadas en *Miller* y establece que la sociedad reconoce que existe una expectativa razonable de intimidad sobre los documentos bancarios contra investigaciones por parte del Gobierno federal. Dicha ley, según enmendada los

zado su doctrina y han resuelto que, bajo sus respectivas constituciones, un cliente de un banco tiene un derecho a la intimidad sobre los documentos bancarios y posee legitimación activa para impugnar un requerimiento gubernamental. Estos Tribunales han decidido que, según la doctrina de *Katz v. United States*, supra, la Cuarta Enmienda protege a las personas y no a los lugares, y que los depositantes tienen una expectativa legítima de intimidad sobre el historial de sus transacciones:

> We believe that it is reasonable for our citizens to expect that their bank records will be protected from disclosure because in the course of bank dealings, a depositor reveals many aspects of her personal affairs, opinion, habit and associations which provide a current biography of her activities. Such a biography should not be subject to an unreasonable seizure by the State government. ... *Since it is virtually impossible to participate in the economic life of contemporary society without maintaining an account with a bank, opening a bank account is not entirely volitional and should not be seen as conduct which constitutes a waiver of an expectation of privacy.* (Énfasis suplido.) *People v. Jackson*, 452 N.E.2d 85, 89 (1983). Véanse, también: *Burrows v. Superior Court of San Bernandino County*, 529 P.2d 590 (Cal. 1974); *State v. Thompson*, 810 P.2d 415 (Utah 1991); *Com. v. Hipp*, 551 A.2d 1086 (1988); *Com. v. DeJohn*, 403 A.2d 1283 (1979); *Charnes v. DiGiacomo*, 612 P.2d 1117 (Colo. 1980); *Winfield v. Div. of Pari-Mutuel Wagering*, 477 So. 2d 544 (1985).

Considerando la naturaleza de los intereses involucrados, la postura de las decisiones estatales citadas es perfectamente compatible con la protección ofrecida por nuestra Constitución. Las personas someten a los bancos información personal con un propósito limitado y, de ordinario, esperan que ésta sea examinada únicamente por los

---

establece procedimientos específicos que deben seguir las agencias federales para obtener información. Véase J.R. Mangan, *Reasonable Expectations of Privacy in Bank Records: A Reappraisal of United States v. Miller and Bank Depositors Privacy Rights*, 72 J.Crim. L. & Criminology 243 (1981).

Posteriormente, el Congreso aprobó la reforma contributiva de 1976 que le concede a los contribuyentes protección adicional contra registros administrativos. Pub.L. No. 94-455, Sec. 1205, 91 Stat. 1702 (1976). Ambos estatutos amplían sustancialmente la expectativa de intimidad que tienen los clientes de los bancos tanto en Estados Unidos como en Puerto Rico, contra investigaciones del Gobierno federal.

oficiales de la institución para verificar la procedencia financiera de la transacción. En la gran mayoría de los casos es imposible hacer una transacción financiera sin antes someter la información requerida por la institución.

Como las decisiones del Tribunal Supremo federal sólo establecen el contenido mínimo de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, entendemos que nuestro ordenamiento ofrece una mayor protección que la ofrecida por la Constitución federal.

En *Pueblo v. Lebrón*, 108 D.P.R. 324, 331 (1979), al aplicar nuestra protección constitucional contra registros y allanamientos, acogimos el criterio de "expectativa razonable de intimidad" expuesto en *Katz v. United States*, supra. Incluso, al comparar lo allí resuelto con las protecciones brindadas por nuestro ordenamiento, señalamos:

> ... *Katz* representa más un refinamiento que una sustitución de la antigua doctrina, así como un recordatorio de los valores centrales que interesa proteger la garantía contra los registros y allanamientos irrazonables: la intimidad del ser humano y su dignidad innata. En este sentido el reconocimiento expreso en la Constitución del Estado Libre Asociado de estos dos valores, Art. III, Secs. 1 y 8, *amplía sensiblemente* el radio del equivalente de la Enmienda Cuarta en nuestra Constitución. (Énfasis suplido.)

En decisiones posteriores hemos reiterado la aplicación del estándar así adoptado de "expectativa razonable de intimidad" ante unas controversias sobre los registros y allanamientos. *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587 (1994); *Pueblo en interés menor N.R.O.*, 136 D.P.R. 949 (1994). Al refinar dicho concepto, explicamos que "[l]a razonabilidad dependerá del balance entre el interés público y el derecho del ciudadano a su seguridad personal, libre de interferencias arbitrarias por parte del Estado". (Énfasis suprimido.) *Pueblo en interés menor N.R.O.*, supra, pág. 964. Dicha determinación dependerá de lo que es aceptable para la sociedad. Es decir, para lle-

gar a ella debemos tomar en consideración nuestra estructura social, los patrones presentes de interacción y los valores y costumbres vigentes. Véanse: LaFave, *op. cit.*, Vol. I, pág. 512; A. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349 (1974).

■■■ Además, cuando en Puerto Rico una parte sostiene que tiene una expectativa razonable de intimidad, su reclamo está amparado en que nuestra Constitución "goza de una vitalidad independiente de la Constitución de los Estados Unidos", y en el área del derecho a la intimidad nuestra Carta de Derechos es de "factura más ancha" que su homóloga federal. Véanse: *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975); *López Vives v. Policía de Puerto Rico*, 118 D.P.R. 219, 227 (1987). En conclusión, la Sec. 10 del Art. II, *supra*, es una instancia clara en la que el contenido de nuestra protección es más amplio que el de la Constitución federal.

## IV

En el Puerto Rico de hoy, es prácticamente una necesidad recurrir a las instituciones bancarias para participar adecuadamente en la vida económica. Las personas recurren con regularidad a los bancos para tomar dinero prestado; depositar e invertir los ahorros derivados de su trabajo; solicitar crédito para comprar sus hogares, y realizar múltiples transacciones financieras. Para efectuar estas actividades, las distintas entidades financieras requieren y reciben información que revela los patrones y estilos de vida de cada uno de sus clientes, así como su situación económica. Mediante dicha información, se puede determinar la ocupación de la persona investigada, los lugares que frecuenta, los bienes que adquiere, a qué partido o grupo político contribuye, los periódicos y las revistas que lee con frecuencia, la iglesia a la cual hace donativos, las asociaciones a las cuales pertenece, las tiendas y los estableci-

mientos donde compra, los médicos que visita y otra información de naturaleza íntima. A modo de ejemplo, véase *California Bankers Assn. v. Shultz*, 416 U.S. 21, 79 (1974), opinión disidente del Juez Douglas.

 Aunque en el caso de las corporaciones, la naturaleza de la expectativa de intimidad es menor que la que tienen las personas, no por ello están desprovistas de toda protección contra intervenciones irrazonables y arbitrarias por parte del Estado. Las corporaciones, al igual que los individuos, suministran a los bancos una gran cantidad de datos bajo la premisa de que serán utilizados únicamente para propósitos bancarios u otros fines legítimos. A través de las cuentas bancarias de una corporación se puede obtener información confidencial sobre sus finanzas y su salud financiera, los salarios y beneficios marginales que ofrece a su personal, los asesores que utiliza y los gastos ordinarios y extraordinarios en que incurre. Las corporaciones no renuncian a su expectativa de intimidad sobre todas sus operaciones empresariales y sus prácticas internas por el mero hecho de utilizar los servicios de una institución bancaria.

 El criterio decisivo para determinar si se trata de una información protegida constitucionalmente es la expectativa razonable de intimidad de los depositantes. Este principio aplica igualmente cuando la relación entre el banco y sus clientes es de otra naturaleza. *Tesorero de P.R. v. Banco etc., y Manrique, Int.*, 46 D.P.R. 308 (1934); *Rodríguez v. Corte*, 42 D.P.R. 766 (1931). Los bancos y las instituciones financieras tienen el deber de salvaguardar la intimidad de sus depositantes so pena de incurrir en responsabilidad civil.(⁴) No olvidemos que a tenor con nuestra jurisprudencia, la protección constitucional al derecho a la intimidad opera *ex propio vigore* entre ciudadanos

(⁴) Véanse, a modo de ejemplo: *Peterson v. Idaho First National Bank*, 367 P.2d 284 (Idaho 1961); *Sparks v. Union Trust Company of Shelby*, 124 S.E.2d 365 (1962).

particulares. *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 64 (1986). A la luz de la práctica bancaria en nuestra jurisdicción, y de la protección que nuestra constitución provee a los ciudadanos contra intervenciones irrazonables del Estado, ni las empresas ni los individuos tienen por qué presumir que al proveer información a los bancos están renunciando a su expectativa de intimidad sobre ella. Véase *Burrows v. Superior Court of San Bernandino County*, supra. A esta misma conclusión llega el profesor Chiesa en su conocido tratado sobre derecho penal procesal, cuando indica que "[c]iertamente *hay una expectativa razonable a que la compañía de teléfonos y el banco mantengan confidencial los récords correspondientes a las llamadas telefónicas y las transacciones bancarias*". (Énfasis suplido.) Chiesa, *op. cit.*, pág. 496.

Por todo lo anterior, resolvemos que tanto RDT como el Sr. Rubén Tresgallo, tenían una "expectativa razonable de intimidad" sobre la información de sus cuentas bancarias en control del Banco Santander, que fuera solicitada por la Contralor. Ellos tenían legitimación activa para impugnar la validez del *sub poena duces tecum* emitido por la Contralora.

## V

Tomando en consideración la normativa antes expuesta, debemos examinar la razonabilidad del requerimiento de documentos impugnado por los demandantes. En el caso de autos, la Contralora llevaba a cabo una investigación de carácter administrativo con relación al contrato de construcción de obra que los demandantes otorgaron con la Compañía de Fomento Recreativo. Como parte de esta investigación, la Contralora tenía autoridad para emitir un *sub poena duces tecum* contra las personas investigadas para que se produjeran los documentos requeridos.

Como hemos señalado anteriormente, el Contralor tiene la facultad constitucional "para obligar, bajo apercibimiento de desacato, a la comparecencia de testigos y a la producción de libros, cartas, documentos, papeles, expedientes, y todos los demás objetos que sean necesarios para un completo conocimiento del asunto bajo investigación". Art. III, Sec. 22, Const. E.L.A., *supra*, pág. 348.

 Por virtud de esta facultad investigativa, al emitir un *sub poena* para que la persona investigada produzca ciertos documentos, el Contralor no necesita una orden judicial previa. Sin embargo, para hacer valer esta facultad de emitir un *sub poena duces tecum*, la Ley Núm. 9 de 24 de julio de 1952 (2 L.P.R.A. sec. 71 *et seq.*) autoriza al Contralor a recurrir a los tribunales para que se encuentre incursa en desacato a cualquier persona citada que se niegue a comparecer o a someter los documentos requeridos. 3 L.P.R.A. sec. 79.

En este caso, la Contralora emitió un *sub poena duces tecum* contra el Banco Santander para que produjera una copia de los documentos en su poder, que estuvieran relacionados con la investigación que sobre RDT y el señor Tresgallo se llevaba a cabo. Esto se llevó a cabo sin notificar a estas personas investigadas. A la luz de la normativa expuesta, concurrimos con el ilustrado foro de instancia en que Tresgallo y RDT tienen una expectativa razonable de intimidad sobre la información de sus cuentas bancarias que tiene el Banco Santander y, por ende, tienen legitimación activa para impugnar la validez del *sub poena duces tecum* emitido en este caso.

Según se desprende de los autos, aunque los demandantes no se enteraron del *sub poena* hasta que la Contralora los citó a una vista, aún en esa etapa tenían el derecho a cuestionar la validez de la citación en un procedimiento judicial. Como ellos no habían sido notificados del *sub poena* hasta esa etapa avanzada de la investigación, ante tal impugnación, el foro de instancia debió examinar la

razonabilidad del requerimiento a base de la autoridad conferida a la Oficina del Contralor, el alcance de la orden y la pertinencia de los documentos requeridos. *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra.

En su comparecencia ante nos, la Contralora ha expuesto los hechos concretos que motivaron su intervención, la autoridad constitucional y legal según la cual la llevó a cabo, los objetivos del *sub poena duces tecum* y la pertinencia de la información que buscaba. A la luz de la evidencia presentada por la Contralora, y considerando que su requerimiento se llevó a cabo bajo el palio de nuestra jurisprudencia en ese momento, concluimos que el *sub poena* fue razonable.

 Somos conscientes de que la Oficina del Contralor es un organismo del Estado creado en la Constitución con rasgos y poderes muy particulares que la distinguen de otras agencias administrativas. No obstante, en ocasiones los hallazgos de los informes preparados por la Oficina del Contralor pueden ser utilizados para iniciar acciones criminales. Por tal razón, es imperioso que en el futuro sus métodos investigativos cumplan estrictamente todas las salvaguardas que surjan a la luz de las normas constitucionales aquí establecidas. Esto significa que cuando la Oficina del Contralor emita un *sub poena duces tecum* contra un banco para que entregue información y documentos en su posesión relacionados con una investigación y sobre los cuales exista una expectativa de intimidad, la persona afectada deberá ser notificada expeditamente de tal requerimiento.

Por los fundamentos que anteceden, *se revoca el dictamen recurrido. Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Negrón García emitió una opinión concurrente. El Juez Asociado Señor Corrada Del Río no intervino.

— o —

Opinión concurrente del Juez Asociado Señor Negrón García.

Vivimos tiempos muy difíciles. La *corrupción en la ejecución de obras gubernamentales a cargo de personas y entidades privadas*, por la ilegal e inadecuada utilización de los fondos públicos, ha alcanzado proporciones alarmantes en esta década. *Estamos ante una enfermedad grave y contagiosa, que poco a poco ha minado la salud y carcomido el entretejido social y la confianza del ciudadano en sus instituciones públicas.* No podemos restringir *severamente el poder investigativo constitucional* de la Oficina de la Contralor en las intervenciones y auditorías sobre las cuentas, los ingresos y los desembolsos, *única "medicina" disponible hoy para sanar tan grave enfermedad.*

*Primero,* los autores de nuestra Constitución eran *muy conscientes y dejaron inequívoca constancia* sobre las transcendentales funciones, prerrogativas, deberes y facultades de la Contralor. Sabían que sus intervenciones serían realizadas conforme a los *principios básicos* de la contabilidad y de la auditoría. 2 Diario de Sesiones de la Convención Constituyente 922–923 (1951).[1] *Desde aquella época hasta el presente, toda auditoría implica examinar e inspeccionar rutinariamente, para su comprobación y verificación, una serie de documentos sin los cuales le es imposible al auditor descargar responsablemente su tarea.*[2] Entre estos, siempre se ha destacado, como procedimiento normal, el examen de los cheques, depósitos y

---

[1] Al respecto, el Delegado Luis Muñoz Rivera al proponer la enmienda de llamarlo "auditor" hizo referencia y citó las obras de W.R. Thompson, *Accounting System*, y de E.L. Kohler y P.W. Pettengil, *Principles of Auditing*, Ed. McGraw-Hill, 1932. Ambas obras eran conocidas entre los profesionales del país y usadas como textos en la Universidad de Puerto Rico.

[2] "Y la jurisprudencia sostiene que el 'audit' no es un mero proceso matemático, sino que incluye también la *investigación, peso y apreciación* de evidencia." *Compañía Popular, etc. v. Gallardo, Sec. Ejec.*, 54 D.P.R. 579, 581–582 (1939).

estados bancarios de la entidad o persona gubernamental o privada de que se trate. E.L. Kohler y P.W. Pettengil, *Principles of Auditing*, Ed. McGraw-Hill, 1932, págs. 52–54.[3]

*Segundo*, no cabe equiparar y extender el *preciado derecho a la intimidad del ciudadano común a la corporación* (entidad jurídica *ficticia*), cuyo *dueño y único accionista* alegadamente incurrió en serias irregularidades en la construcción de una obra de gobierno millonaria y se lucró con fondos públicos.

*Tercero, quien contrata y obtiene ganancias del Gobierno no tiene la misma expectativa de intimidad*; en particular, el Sr. Rubén Tresgallo, Presidente y *único* accionista que *controla y domina* a RDT Construction Corp. (RDT), y tiene "plenos poderes para dirigir y administrar los negocios y asuntos" corporativos. 14 L.P.R.A. sec. 1102(3)(c). *Como entidad ficticia, RDT Construction Corp. vive, actúa, contrata, funciona y se pronuncia a través de su dueño, el señor Tresgallo. Cuarto, RDT Construction Corp. debe su existencia y está sujeta a la Ley de Corporaciones; de ella emanan sus derechos y deberes.* No puede *selectivamente* reclamar derechos sin afrontar sus obligaciones. *Quinto*, exigir a la Contralora la obtención de un permiso previo en una vista judicial, para requerir documentos bancarios, *es despojarla de su facultad constitucional de expedir "sub poenas".* Sexto, se trata de un *"sub poena" constitucional*, cuya expedición por la Contralora, *no puede presumirse ilegal. Séptimo*, no aplica la doctrina jurisprudencial penal

---

[3] No podría ser de otro modo. "Cuando los pagos se efectúan por cheques, la prueba que *debe examinarse* además de los comprobantes, es la que ofrecen los cheques pagados, o sea, los que se devuelven al librador después de haber sido pagados por el banco." W.H. Bell y R.S. Johns, *Intervención y Fiscalización de Contabilidades*, (Orlando López-Hidalgo, traductor), The University Society, 1942, T. I, pág. 77. En la materia de *auditoría* se acepta como un documento altamente confiable el *cheque*, pues éste "lleva el endoso de la persona pagada y la perforación o sello indicativo del banco pagador. Debido a que es revisado y procesado por terceros, usualmente los auditores lo miran como un tipo de evidencia muy fuerte. Sirve para ver que se adquirió un activo a determinado costo, o como prueba de que se pagó una deuda o se incurrió en un gasto". (Traducción nuestra.) O.R. Whittington, K. Pany, W.B. Meigs y R.F. Meigs, *Principle of Auditing*, Irwin, Ed. Tenth, 1992, pág. 198.

sobre los registros y allanamientos, por su propia naturaleza *distinta y distinguible.*

*Debemos evitar todo enredo conceptual entre persona natural y jurídica que nos lleve a tejer para siempre un manto de secretividad corporativo tan amplio, que anquilose y convierta en letra muerta el poder investigativo constitucional de la Contralor.*(4) Menos, imponerle la onerosa carga de siempre tener que conseguir cientos de órdenes judiciales para los casos que investigue. Éstos exigen *rutinariamente* examinar libros, documentos de contabilidad y cuentas bancarias. *Al final y a la postre, la fecunda imaginación humana siempre podría encontrar, en los intersticios de cada pieza documental propiedad de otro, una expresión del "poliforme" derecho a la intimidad.*

*Coincidimos,* pues, con la opinión del Tribunal que sostiene, al amparo de su facultad investigativa *constitucional-estatutaria,* que la Contralor puede expedir legítimamente *sub poenas* y requerir, sin *orden judicial previa,* copias de los estados de cuentas, depósitos y cheques y otra información financiera, en posesión de instituciones bancarias, sin el consentimiento inicial de la corporación o persona investigada que contrató y ejecutó obras públicas gubernamentales.

## I

RDT Construction Corp. (Sr. Rubén Tresgallo), *empresa privada* con *fines de lucro,* sometió la documentación correspondiente y obtuvo la buena pro en *subasta pública,* que fue celebrada por la Compañía de Fomento Recreativo,

---

(4) Difícilmente, RDT Construction Corporation como corporación, ente *ficticio* e *inanimado, va a un banco* a solicitar un crédito para comprar un hogar. Su *"ocupación"* es de conocimiento público. Claro está, *una corporación* no ofrece datos "sobre los lugares que *frecuenta,* los bienes que adquiere, a qué *partido político contribuye".* Más difícil nos resulta imaginarnos "los periódicos y revistas que frecuentemente lee, la iglesia a la cual hace donativos, las asociaciones a las cuales pertenece, las tiendas y establecimientos *donde compra, los médicos* que lo atienden y cualquier otra información de naturaleza muy íntima".

para construir el *Pabellón de la Paz* en el Parque Luis Muñoz Rivera en San Juan. Realizada la obra, la Compañía de Fomento Recreativo pagó con fondos del erario a RDT Construction Corp. conforme a las documentaciones y certificaciones de rigor.

El 7 de agosto de 1991, la Contràlor inició una auditoría de la Compañía de Fomento Recreativo que cubría desde el 1ro de enero de 1988 al 31 de diciembre de 1992. Expidió unas citaciones formales al Banco Santander (*sub poena duces tecum*) para solicitar, en específico, copias de los cheques, depósitos y estados de las cuentas de RDT Construction Corp. y de su Presidente, único accionista, el señor Tresgallo. *La pertinencia y especificidad de estos documentos no se cuestiona. Abarcan la etapa de la subasta, el comienzo de la construcción y los momentos de mayor movimiento de desembolsos. El Banco Santander los entregó.*

A su vez, el señor Tresgallo fue citado (*subpoena ad testificandum*) para que compareciera el 15 de septiembre de 1992 a la Oficina de la Contralor a "declarar en relación con la investigación". Asistió de forma voluntaria y, sin reservas, *prestó una declaración jurada*, según le fue solicitada,[5] que, luego de haber sido transcrita, se negó a firmar.

Aproximadamente seis (6) meses más tarde, en marzo de 1993, *la investigación reflejó supuestas serias irregularidades (apropiación de fondos públicos, falsificación de documentos y vicios de construcción) en la construcción del Pabellón de la Paz, vinculadas a las acciones del señor Tresgallo.* En virtud del Reglamento Núm. 35,[6] el señor

---

[5] La obligación de advertir del derecho a no autoincriminarse *surge cuando la investigación se centraliza sobre una persona que esté bajo la custodia del Estado e interrogada como sospechoso. Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Miranda v. Arizona*, 384 U.S. 436 (1966); E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 2.3. Ciertamente, una persona requerida a prestar una declaración jurada a través de un *subpoena* del Contralor, no se encuentra "bajo custodia".

[6] Aprobado el 16 de octubre de 1992 y puesto en vigor treinta (30) días después de su presentación en el Departamento de Estado.

Tresgallo fue notificado de una audiencia para darle la oportunidad de explicar o esclarecer los hallazgos investigativos antes de que se rindiera el informe oficial final.

*No acudió.* Posteriormente, el señor Tresgallo, por sí y en nombre de RDT Construction Corp., solicitó del Tribunal Superior, Sala de San Juan, una orden de entredicho provisional que impidiera el uso de los documentos obtenidos del Banco Santander y su declaración por alegadamente contravenir sus derechos constitucionales contra los registros y allanamientos irrazonables (Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1) y la autoincriminación (Art. II, Sec. 11, L.P.R.A., Tomo 1). El tribunal de instancia se negó a ello y dispuso la continuación por la vía ordinaria.

La Oficina de la Contralor solicitó una sentencia sumaria. Invocó su facultad constitucional para investigar, la carencia de expectativa razonable de intimidad sobre los documentos aludidos y la correcta obtención de la declaración del señor Tresgallo. Oportunamente, el ilustrado tribunal de instancia (Hon. Arnaldo López Rodríguez, Juez) dictó la sentencia y decretó irrazonable e ilegal el "registro" de las cuentas bancarias y ordenó su devolución. En su dictamen, *prohibió* que fueran utilizados en la auditoría practicada a la Compañía de Fomento Recreativo. *Erró.*

## II

En nuestro panorama jurídico, las facultades investigativas y la posición de la Contralor de Puerto Rico, de *génesis constitucional, son únicas.* Se creó para fiscalizar las cuentas, los ingresos y los desembolsos gubernamentales (*post audit*) y determinar si fueron hechos conforme a la ley. Diario de Sesiones, *supra*, págs. 920–927, 963–965, 1763, 1968–1973, 2577 y 2587–2588. Como tal, es una figura sui géneris.

La Sec. 22 del Art. III de la Constitución, *supra*, ed. 1982, pág. 347, en lo pertinente, dispone:

> ... El Contralor fiscalizará todos los ingresos, cuentas y desembolsos del Estado, de sus agencias e instrumentalidades y de los municipios, para determinar si se han hecho de acuerdo con la ley. Rendirá informes anuales y todos aquellos informes especiales que le sean requeridos por la Asamblea Legislativa o el Gobernador.

Ella vela por el fiel cumplimiento de la política pública encarnada en la Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230 de 23 de julio de 1974 (3 L.P.R.A. secs. 283–283p) y *otros estatutos* que, en síntesis, *exigen que los gastos y fondos públicos sean legítimos y legales y promuevan la máxima economía y óptima utilización de los recursos públicos y que los gastos del Gobierno se hagan dentro de un marco de utilidad, necesidad y austeridad.*

*No se debate que la Oficina de la Contralor es parte del Poder Legislativo.* Diario de Sesiones, *supra*, págs. 920 y 925; *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945 (1993).[7] *Commoloco of Caguas, Inc. v. Benítez Díaz*, 126 D.P.R. 478 (1990); *E.L.A. v. Asoc. Empleados Obras Púb.*

---

[7] Esta decisión tiene la peculiaridad de constituir el respetable criterio de sólo tres (3) jueces: su ponente, el Juez Asociado Señor Hernández Denton y los Jueces Asociados Señores Rebollo López y Alonso Alonso.

El Juez Asociado Señor Fuster Berlingeri disintió. Expuso que, por la semejanza de la entidad involucrada con una corporación público-privada, *"no es constitucionalmente indispensable que la Contralor de Puerto Rico obtenga una orden judicial de registro antes de poder examinar* los libros, documentos y expedientes relativos al uso que hace dicha entidad de las facilidades del Hospital Subregional de Carolina. En las circunstancias particularísimas de este caso, el peso de los intereses en conflicto, según mi criterio, se inclina a favor de eximir a la Contralor de la carga al expedito desempeño de sus funciones que implica someter su clara autoridad *a la supervisión judicial previa"*. (Énfasis suplido.) *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945, 982 (1993). Más adelante aludió a la extensa e íntima supervisión y reglamentación gubernamental de la entidad y, subsiguientemente, consignó estar ante "una situación de *registro administrativo* en la cual las normas constitucionales pertinentes son más flexibles que en los casos de registro penal". (Énfasis en el original.) Íd., pág. 984.

El Juez Presidente Señor Andréu García, la Juez Asociada Señora Naveira de Rodón y el que suscribe se inhibieron.

*Mun.*, 126 D.P.R. 320 (1990); *In re Ríos*, 112 D.P.R. 353 (1982). Como *brazo auxiliar* de la Asamblea Legislativa, fue dotado de *iguales poderes investigativos por la propia Constitución.*([8]) Con *particularidad*, se le autorizó a:

> ... [T]omar juramentos y declaraciones y *para obligar*, bajo apercibimiento de desacato, a la comparecencia de testigos y a la *producción de libros, cartas, documentos, papeles, expedientes*, y *todos* los demás objetos que *sean necesarios para un completo conocimiento del asunto bajo investigación.*([9])

Debido a su *alto linaje constitucional*, no podemos *recortar sustancialmente* sus poderes ni equipararlos y dejarlos más débiles que muchas agencias administrativas, cuyo origen es estatutario. Continúan vigentes los pronunciamientos siguientes de *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, págs. 964-965:

> Es tarea germinal del Contralor determinar la legalidad de todas las cuentas, los ingresos y los desembolsos de propiedades y fondos públicos. *Para la consecución de esa tarea nuestro ordenamiento le confiere un vasto poder para investigar.* Según el preclaro imperativo constitucional, *ese poder se extiende* para *requerir* aquella evidencia testifical [o d]ocumental *que sea necesaria* para el más cabal entendimiento de la materia bajo investigación. *Por lo tanto, la autoridad del Contralor para requerir la producción de testimonio o de documentos se determina según su pertinencia con un asunto legítimamente objeto de fiscalización.* Ello implica que, cuando el curso de una investigación de los desembolsos públicos así lo exija, *el Contralor podrá requerir información de entidades privadas hasta donde sea necesario para esclarecer el asunto en cuestión.* (Énfasis suplido.)

---

([8]) Sabido es, *"[l]a facultad y el deber de la Asamblea Legislativa de fiscalizar la ejecución de la política pública* y la conducta de los jefes de departamento *mediante el ejercicio de sus vastos poderes de investigación han sido reconocidos*, después de la Constitución, por este Tribunal. *Hernández Agosto* v. *Romero Barceló*, 112 D.P.R. 407, 428 (1982)". (Énfasis suplido.) *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576, 590 (1983). Véase, además, *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986).

([9]) La Ley Núm. 9 de 24 de julio de 1952 (2 L.P.R.A. sec. 71 *et seq.*) implantó este mandato constitucional y habilitó la Oficina de la Contralor. Sus Reglamentos Núms. 27 y 36 conceden a sus funcionarios estos mismos poderes.

El dictamen de la ilustrada sala de instancia, con *abstracción de las peculiares prerrogativas investigativas constitucionales de la Contralor, le exige un permiso judicial previo* para investigar las cuentas bancarias de las entidades y personas privadas que hayan contratado con el Gobierno y que se hayan lucrado con fondos públicos. Ello es contrario a lo resuelto por este Foro, a los efectos de que la Constitución "deposit[ó] en manos de la Oficina de la Contralor la *determinación inicial de pertinencia*" y que la facultad de los tribunales sólo es "para dirimir controversias sobre *este último requisito*". (Énfasis suplido.) *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra pág. 971.

Aquí, la corporación RDT (señor Tresgallo) realizó una obra de construcción gubernamental, cuyo contrato generó a su favor unos desembolsos millonarios de fondos públicos. ¿Cómo puede seriamente cuestionar la *legitimidad* de la intervención de la Contralor? *¿Cómo sostener que los documentos bancarios no son pertinentes?* Como veremos, que algunos documentos estuvieran en poder de un *tercero* (Banco Santander), no afectó en manera alguna su poder de requerirlos *directamente —sin tener que acudir a un tribunal en ese momento— por estar razonablemente relacionados al asunto bajo investigación. Y nadie ha podido sostener lo contrario: el requerimiento es razonable, definido y los documentos bancarios fueron y son pertinentes en la investigación "post audit" sobre la construcción del Pabellón de la Paz efectuada por RDT Construction Corporation (señor Tresgallo).*

Como dijéramos, enfatizamos que la Oficina de la Contralor posee vastos poderes investigativos *constitucionales*, entre ellos, el de emitir citaciones administrativas (*sub poena*) para " 'la comparecencia de testigos y a la producción de libros, *cartas*, documentos, papeles, expedientes y *todos los demás objetos que sean necesarios para un completo conocimiento del asunto bajo investigación*' ". (Énfasis en el original suprimido y énfasis suplido.) *H.M.C.A. (P.R.),*

*Inc., etc. v. Contralor*, supra, pág. 961. Estas órdenes, de carácter oficial, van dirigidas a una persona o entidad para obligarla a declarar *(sub poena ad testificandum)* o que produzca todo tipo de libros, expedientes u otros documentos que tenga bajo su control *(sub poena duces tecum). Su emisión no precisa de una orden judicial previa.* Sin este poder, y el *potencial* auxilio coercitivo del desacato en los tribunales, sólo podría lograr la información cuando el requerido consintiera. *Pecaríamos de ingenuidad judicial si no advirtiéramos la natural renuencia de muchas personas y sus corporaciones a entregar documentos y cheques bancarios para fines investigativos, máxime, como en el caso de autos, que tienden a revelar y confirmar graves irregularidades en la legalidad de los desembolsos de dineros públicos.*

El poder de investigación de la Contralor es tan *vital* para el descargo responsable de su encomienda, que es el *único* funcionario que la Constitución, *pormenorizadamente*, le *autorizó* a requerir toda clase de documentos *necesarios, incluso los más privados*, como lo son las cartas, cuyo contenido, de ordinario, está limitado a su autor y destinatario. La amplitud de estos poderes fue concebida, en palabras de los Constituyentes, para que la Contralor realice "sin *entorpecimientos, las investigaciones que crea necesarias*". (Énfasis suplido.) Diario de Sesiones, *supra*, pág. 2588.

*Para la Contralor poder expedir "sub poenas", la Constitución no le exige que vaya antes a los tribunales a demostrar su pertinencia o procedencia.*([10]) *Tal exigencia constituiría una arbitrariedad que distorsiona y desnaturaliza la cronología, utilidad y facultad del mecanismo constitucio-*

---

([10]) Expedido el *sub poena*, la Ley Núm. 9, *supra*, autoriza a recurrir *después* al Tribunal Superior en caso de *rebeldía o negativa a obedecerlo*, al amparo de su poder constitucional para citar testigos y compeler la presentación de evidencia.

En ese momento el requerido puede plantear los fundamentos por los cuales estima es improcedente el *sub poena*. Una vez resuelto el asunto, si es requerido, incurrirá en desacato si desobedece la orden del tribunal. 2 L.P.R.A. sec. 79.

*nal de citación por "sub poenas".*([11]) *Además, incurriríamos en el serio error conceptual de equiparar una citación administrativa con una criminal,* lo que absurdamente nos llevaría a aplicarle a la Contralor (*en sus efectos más restrictivos*), la jurisprudencia *penal contra los registros y allanamientos irrazonables.*

Una citación administrativa investigativa de la Oficina del Contralor es para descubrir y procurar evidencia que determine la validez de las operaciones fiscales de la agencia pública investigada. No es para probar un caso pendiente; basta con examinar si están presentes los estándares *razonables* legislativos o administrativos que justifican dicho requerimiento. E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.21, pág. 470. *La facultad para examinar unos documentos bancarios no depende de la existencia de un caso o una controversia, sino del descargo del deber ministerial que la Constitución le impuso: la curiosidad oficial de la Contralor es un mandato constitucional.*([12])

---

([11]) El cargo de Contralor fue investido de una serie de salvaguardas y prerrogativas *constitucionales* para que pueda ejercer su *deber ministerial* de fiscalizar las cuentas y los fondos públicos de nuestro sistema de gobierno, *libre de cualquier presión de tipo político-partidista y en un ambiente de completa autonomía.*

Estos *poderes especiales* tienen su razón de ser en el hecho de que auditará las cuentas y los desembolsos de fondos públicos de todas las ramas de gobierno —Ejecutivo, Legislativo y Judicial— por lo que su poder investigativo no puede estar sujeto a la voluntad y al capricho de las entidades que *potencialmente* serán objeto de una auditoría en el futuro.

*La Rama Judicial no está exenta de esas auditorías.* En el ejercicio de nuestra delicada función de último intérprete de la Constitución, nos abstenemos prudencialmente de modificar, disminuir y entorpecer sus *facultades constitucionales investigativas,* máxime cuando surgen *expresamente* del texto de la propia Constitución.

Su importancia y jerarquía es tal, que es uno de los nueve (9) funcionarios (Gobernador y los Jueces de este Tribunal) sujetos al juicio de residenciamiento establecido en el Art. III, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1.

La experiencia ha demostrado la sabiduría de los autores de la Constitución. No son pocas las ocasiones en que sus informes generan tensiones y críticas de los funcionarios que hayan sido intervenidos.

([12]) Sus investigaciones son de carácter puramente civil, y los hallazgos utilizados en la redacción de un informe para beneficio de todas las ramas de gobierno y del pueblo en general. 2 L.P.R.A. secs. 82 y 83. El que una investigación pueda motivar una posterior investigación criminal, no altera de manera alguna la naturaleza civil de esa investigación. *Hannah v. Larche*, 363 U.S. 420, 443 (1960).

En *H.M.C.A., (P.R.), Inc., etc. v. Contralor*, supra, a través de un *sub poena*, los funcionarios de la Contralor pretendieron realizar un registro ilimitado al penetrar e intervenir físicamente el local de las oficinas de H.M.C.A. para inspeccionar y examinar todos los documentos que consideraban pertinentes. En ese escenario, totalmente distinto al de autos, se dijo que no bastaba con el *sub poena* y que para realizar ese tipo de investigación e inspección se tenía que cumplir *antes* con el requisito *estatutario* de una orden judicial de la Sec. 6.1 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (en adelante L.P.A.U.), Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. sec. 2191).([13])

El ilustrado foro de instancia resolvió correctamente que el *Right to Financial Privacy Act*, 12 U.S.C. sec. 3401 *et seq.* —que fija unos requisitos de notificación al cliente (persona natural, *no una corporación*) para la investigación de sus cuentas bancarias— sólo aplica a las autoridades federales y no es extensivo a los estados ni a Puerto Rico.

Aún así, incidió al considerar equivalente funcional la referida Sec. 6.1 de L.P.A.U., que reglamenta los *registros* administrativos. *Como sabiamente hoy ha concluido este Tribunal, dicho precepto es inaplicable al caso de autos, pues "se trata exclusivamente de un requerimiento de documentos que emitió la Contralora, en virtud de su poder de 'sub poena' ".* (Énfasis suplido.) Opinión del Tribunal, pág. 433.

*Ningún precepto estatutario o interpretación judicial*

---

([13]) Aún así, este Tribunal dictaminó que la Contralor, en su comparecencia ante el tribunal de instancia y este Foro, había cumplido con el requisito de presentar una evidencia concreta justificativa de la *razonabilidad* de su intervención.

Así ha ocurrido en el recurso que nos ocupa. Evaluados los argumentos de RDT Construction Corporation (señor Tresgallo), una vez resuelto que no tienen suficiente expectativa de intimidad como para impedir la inspección de los documentos bancarios en una situación de interés apremiante gubernamental —como en el caso de autos— no existe fundamento jurídico ni base racional alguna para anular y prohibirle a la Contralor utilizar los documentos entregados voluntariamente por el Banco de Santander.

*puede contravenir o anular una disposición constitucional tan precisa y expresa como es la facultad para "sub poena" fijado en la Sec. 22 del Art. III antes transcrita.* Al igual que ocurre con las prerrogativas constitucionales del Poder Judicial, la Asamblea Legislativa puede promulgar una ley que afecte la Oficina de la Contralor, *siempre y cuando no disminuya o coarte sus facultades investigativas y obligaciones de rango constitucional.* Esta limitación la reconoció la Asamblea Legislativa, pues en la propia L.P.A.U. estableció que cubriría y aplicaría a todas las agencias no excluidas expresamente, y definió las "agencias" como aquellos organismos del E.L.A. *"autorizados por ley a investigar".* Hemos visto que la *característica fundamental* de la facultad investigativa de la Contralor es de *estirpe constitucional, no estatutaria.*

No tiene razón RDT Construction Corporation (señor Tresgallo) al argumentar que a los *sub poenas* de la Contralor le aplican las disposiciones de la L.P.A.U., bajo el simple fundamento de que el legislador no lo excluyó expresamente. En ese extremo, los pronunciamientos en *H.M.C.A (P.R.), Inc., etc. v. Contralor,* supra, no gobiernan el caso de autos. La *independencia de criterio* de la Contralor, tan exaltada por los creadores de nuestra Constitución, no puede ser así inmolada; esa interpretación le coartaría y la sometería al capricho de los Poderes Legislativo y Judicial.

Aclarado este aspecto, recordamos que, por su naturaleza, la *autoridad constitucional de la Contralor* para emitir citaciones administrativas *(sub poenas) no está limitada* a aquellos sobre quienes puede ejercer su jurisdicción regulatoria,[14] sino que *se extiende a toda persona de la*

---

[14] En esa etapa inicial no se permite la intervención judicial por razones prácticas. *Primeramente,* si se permitiera al tribunal determinar si una agencia posee jurisdicción sobre un área específica o sobre la persona investigada, esto podría atentar contra la participación de la agencia y privaría al tribunal del beneficio de la decisión final de ésta, en la que la controversia y los hechos estarían más depurados. *Segundo,* tolerar la intervención judicial en la determinación de jurisdicción tendría

*cual pueda obtenerse información relevante y pertinente a su investigación.*([15]) Véanse: *Federal Communications Commission v. Cohn*, 154 F. Supp. 899, 906 (S.D. N.Y. 1957); B. Schwartz, *Administrative Law*, 3ra ed., Boston, Ed. Little, Brown and Co., 1991, Sec. 3.12. Puede requerir testimonios y documentos pertinentes, a pesar de que la citación sea dirigida a un tercero no sujeto directamente a su jurisdicción u objeto de la investigación. Sólo es menester que los documentos sean pertinentes, definidos y estén dentro de su autoridad. Schwartz, *op. cit.*

## III

La Sec. 10, Art. II de la Carta de Derechos, L.P.R.A., Tomo 1, consagra la protección *contra los registros y allanamientos irrazonables.* Al extendérsela *mecánicamente* a RDT Construction Corporation (señor Tresgallo), el reputado foro de instancia *pasó por alto* que esta protección se extiende a los ciudadanos y las corporaciones sólo contra *citaciones irrazonables* de las agencias administrativas. *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 206 (1984); *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 401 (1983); *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra.

Cometió error al así aplicarla, pues el criterio de la *razonabilidad* dependerá de si la *investigación está autorizada por ley,* que el requerimiento *no sea demasiado indefinido* y que la información guarde *razonable pertinencia* con el asunto específico investigado. *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra; *E.L.A. v. P.R. Tel. Co.*, supra, pág. 402; *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 747–748 (1976); *Comisionado de Seguros v. Bradley*, 98 D.P.R. 21,

---

el efecto de entorpecer y demorar los procedimientos administrativos. D. Fernández, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 1ra ed., Colombia, Ed. Forum, 1993, Sec. 5.2.

([15]) Una agencia administrativa tiene el poder de emitir una citación administrativa incluso para determinar si tiene jurisdicción sobre la materia bajo investigación. *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 211 (1946).

31 (1969). En el caso de autos, el requerimiento de los documentos bancarios por la Oficina de la Contralor cumplió satisfactoriamente con las condiciones de *razonabilidad constitucional* antes expuestas.

Tales documentos son *razonablemente pertinentes* a la investigación e indudablemente ayudan a detectar y trazar el movimiento de los fondos públicos de la Compañía de Fomento Recreativo en su relación contractual con la empresa privada RDT Construction Corporation (señor Tresgallo). Sólo examinando el cuadro *completo, integral y específico* de esas erogaciones en los distintos períodos relacionados con la contratación, puede realmente conocerse si los desembolsos se destinaron conforme a la ley.[16]

## IV

Esclarecido *el origen y la validez constitucional de los "sub poenas"* de la Contralor, es evidente que el método escogido es compatible con las garantías de nuestra Constitución. *Conocemos la visión de la Asamblea Constituyente sobre los principios básicos de auditoría y los documentos necesarios bajo los cuales funciona la Oficina del Contralor.* Se trata de "normas generalmente aceptadas que est[á]n de acuerdo con con las prácticas corrientes del examen de cuentas". 2 L.P.R.A. sec. 73.[17] El descargo eficaz de esa función es un *imperativo constitucional, imposible de realizar* si no se tiene la información *financiera* de las cuentas bancarias. *Government Auditing Standards,*

---

[16] El Tribunal Supremo federal ha resuelto que "cuando un 'subpoena' es objetado bajo el fundamento de pertinencia, la moción para que se anule tiene que ser denegada a menos que la corte de distrito determine que no hay una posibilidad razonable de que la categoría de materiales que el Gobierno solicitó producirá información relevante en general sobre el objeto de la investigación del Gran Jurado". (Traducción nuestra.) *United States v. R. Enterprices, Inc.*, 498 U.S. 292, 301 (1991).

[17] El Manual de Redacción de Informes de Auditoría de la Oficina del Contralor de Puerto Rico de 1992, bajo el acápite Período Cubierto y Normas Aplicables, expone que "[e]l examen se realizó de acuerdo con las normas de auditoría gubernamental generalmente aceptadas en lo que concierne a los aspectos financieros y del desempeño o ejecución". Pág. 12-8.

Rev. 1994, Cap. 2, inciso (12), págs. 2–6. La importancia de examinarlas ha sido siempre un principio rector en auditoría.[18]

*"En Dios confiamos, a todos los demás los auditamos"*, pensamiento que recoge pragmáticamente el sentir de los profesionales sobre la auditoría. La Asociación Americana de Contabilidad define "auditoría" como un proceso sistemático mediante el cual se *obtiene y evalúa objetivamente la evidencia* relacionada a eventos y transacciones económicas para determinar el grado de correspondencia entre esa evidencia y los criterios establecidos, y comunicar los resultados a personas interesadas. H. Johnson, *Auditing*, 4ta ed., Houston, Dame Pubs. Inc., 1991, T. X, pág. 6.[19]

Sería *ilógico y en abierta violación a nuestra Constitución y a los principios básicos de auditoría,* imponerle a la Contralor que, para cumplir con su deber como auditor de las agencias del E.L.A. y empresas privadas que con ellas contratan, antes de expedir un *sub poena* tenga que solicitarle permiso al tribunal.

---

[18] "[U]n cliente puede mantener cuentas bancarias no consignadas en los libros para propósitos *tales como pagar sobornos ilegales.*" (Traducción nuestra.) Whittington, Pary, Meigs & Meigs, *op. cit.*, pág. 415.

[19] Esa evidencia es la *única manera* de poder determinar si los negocios, operaciones y demás eventos económicos, bajo investigación, se realizaron conforme a los criterios establecidos, conocidos como *Principios Generales Aceptados en Auditoría (Generally Accepted Accouting Principles (GAAS))*. Estos eventos y negocios de ordinario se incluyen en los estados financieros (*financial statements*), documentos que generalmente el auditor solicita. *Una auditoría gubernamental es más amplia que una interna de entidad privada.* No sólo se examinan los estados financieros, sino se determina si los programas del Gobierno han alcanzado sus objetivos y las agencias de Gobierno y empresas privadas contratantes han cumplido con las leyes y los reglamentos vigentes.

En 1974 se publicó, lo que más tarde se adoptó, como los mandamientos del GAAS. El Núm. 6 impone a todo auditor el deber de obtener evidencia suficiente y competente a través de su propia investigación, observación *o solicitándola* para tener una base racional sobre la cual descansar su opinión de los estados financieros bajo investigación.

# V

*H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, págs. 972-973, resolvió:

La Cuarta Enmienda de la Constitución federal garantiza que todo registro gubernamental se hará en virtud de una orden fundamentada en causa probable, fundada en juramento o afirmación. *Valga señalar que no toda intervención gubernamental es un registro a la luz de esta enmienda. Ocurre un registro sólo cuando la expectativa razonable de intimidad de una persona ha sido transgredida.* Véanse: *California v. Ciraolo*, 476 U.S. 207, 209 (1986); *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Katz v. United States*, 389 U.S. 347, 351–352 (1967); E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.13, pág. 404. (Énfasis suplido.)

Sabido es que una *expectativa razonable de intimidad* se configura "si la persona tiene un derecho razonable a abrigar, donde sea, *dentro de las circunstancias del caso específico*, la expectativa de que su intimidad se respete". *Pueblo v. Lebrón*, 108 D.P.R. 324, 331 (1979), siguiendo a *Katz v. United States*, 389 U.S. 347 (1967).

*La expectativa de intimidad no es absoluta ni incondicional. Varía; está sujeta a excepciones más o menos razonables, por lo que el dato se hace comunicable en atención a los legítimos intereses apremiantes en juego. En algunas situaciones puede ser fuerte o débil, o simplemente, ausente. Un individuo tiene una expectativa de intimidad mayor que una corporación.*

Ni RDT Construction Corporation ni tampoco el señor Tresgallo poseían una *expectativa razonable de intimidad* sobre los expedientes de las cuentas bancarias, que habían sido obtenidos por la Contralor, por varios fundamentos: la naturaleza y los *límites de toda corporación*; la contratación por *subasta pública*; características *de las cuentas bancarias*, y el *carácter razonable administrativo del examen. Elaboremos esto.*

Ciertamente, hemos extendido la protección contra los

registros y allanamientos *irrazonables a corporaciones.* "Los establecimientos comerciales, sean o no propiedad de corporaciones, pueden invocar la Cuarta Enmienda." *E.L.A. v. Coca Cola Bott. Co.,* supra, pág. 209. Véase *H.M.C.A. (P.R.), Inc., etc. v. Contralor,* supra. Sin embargo, por su *naturaleza* ficticia, una corporación *no puede reclamar el mismo derecho a la intimidad* del que goza un ciudadano natural bajo la protección constitucional contra registros y allanamientos irrazonables; la expectativa *es mucho menor. United States v. Morton Salt Co.,* 338 U.S. 632, 652 (1950).

En nuestro ordenamiento jurídico, las corporaciones privadas son personas jurídicas que existen por virtud de la ley. Su personalidad no es perpetua; puede ser limitada e, incluso, revocada. 14 L.P.R.A. sec. 2012. *La reglamentación e intervención gubernamental es amplísima.* Su certificado de incorporación es *público.* "[L]os libros, *cuentas, archivos* y *demás documentos* de todas las corporaciones del país y corporaciones extranjeras autorizadas" están sujetos a inspección y examen por el Secretario de Estado y el Secretario de Hacienda. 14 L.P.R.A. secs. 421 y 422.

Toda corporación *anualmente* tiene que presentar un *informe* en el Departamento de Estado. Éste debe contener un *estado de su condición económica, preparado conforme a los principios de contabilidad generalmente aceptados.* 14 L.P.R.A. sec. 2301. Debe exponer una relación de los *nombres y las direcciones postales de todos los directores y oficiales de la corporación* en funciones, a la fecha cuando se rinda el informe, y las fechas en que termina el período de duración de sus respectivos cargos, y cualquier otra información requerida por el Secretario de Estado.([20])

---

([20]) Debe llevar y conservar aquellos libros de contabilidad, documentos y constancias (incluyendo expedientes de inventarios) suficientes para establecer con realidad el monto del *ingreso bruto y las deducciones, los créditos y otros detalles relacionados con las operaciones dentro y fuera de Puerto Rico, que deban aparecer en sus planillas de contribuciones sobre ingresos,* y reflejar claramente el monto de sus inversiones dentro y fuera de Puerto Rico, la propiedad poseída por la corporación, y

*Una entidad corporativa no puede reclamar un derecho irrestricto para llevar a cabo sus negocios en secreto.* Véase *Colegio Puertorriqueño v. Pesquera de Busquets*, 464 F. Supp. 761, 766 (P.R. 1979). La naturaleza y los propósitos de la entidad corporativa, y el *interés que habrá de ser protegido*, determinarán si según un cuadro de hechos específicos, tiene un derecho a la intimidad que merezca protección. *United States v. Hubbard*, 650 F.2d 293, 306 (2do Cir. 1981); *Colegio Puertorriqueño v. Pesquera de Busquets*, supra, pág. 766. Tales corporaciones están abiertas a cierto tipo de intromisiones por parte del Gobierno, que no serían permisibles en un contexto puramente privado. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977).

La protección establecida en la Sec. 10 de nuestra Carta de Derechos, *supra*, repetimos, no es un principio absoluto; permite excepciones fundadas en *intereses apremiantes*. *E.L.A. v. Puerto Rico Tel. Co.*, supra, pág. 403 El *interés apremiante* en el caso de autos es la efectiva fiscalización de los desembolsos de fondos hechos por la Compañía de Fomento Recreativo a RDT Construction Corporation (señor Tresgallo), conforme al mandato constitucional.

No hay duda de que el *interés apremiante del Estado*, en cuanto a que sus fondos sean utilizados únicamente para fines públicos, sobrepasa cualquier interés que pueda tener un ente *corporativo ficticio*, en particular si se ha lucrado con fondos públicos. Cuando RDT Construction Corporation (señor Tresgallo) *voluntariamente* decidió contratar

---

el monto del capital empleado en la gestión de sus negocios dentro y fuera de Puerto Rico.

Las actividades de la corporación, no relacionadas directamente con sus propósitos, también están reglamentadas por el Estado. A modo de ejemplo, la cantidad máxima que pueden aportar a candidatos o partidos políticos está limitada en años eleccionarios a un máximo de dos mil quinientos dólares ($2,500). Art. 3.005 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3105. Cuando un sólo individuo posee un control mayoritario en una corporación, la contribución política realizada por él se imputa a la corporación y viceversa. Art. 3.008 (16 L.P.R.A. sec. 3108). De otra parte, se le impone al partido político que recibe la donación que *informe* a la Comisión Estatal de Elecciones la *identificación* del contribuyente, sea éste un individuo, sea una corporación. 16 L.P.R.A. sec. 3111.

con la Compañía de Fomento Recreativo para la realización del Pabellón de la Paz, su *expectativa de intimidad se vio reducida aún más*. El contrato entre la Corporación de Fomento Recreativo y RDT Construction Corporation (señor Tresgallo) fue el resultado de una *subasta pública*. Ese trámite exigió la evaluación y entrega *voluntaria* de diversos *documentos*, incluso de *información* confidencial sobre su *solvencia económica*; esto es, su capacidad monetaria para poder cumplir con su oferta. Esa información, de naturaleza muy *íntima*, comprendió el nombre del dueño, el número del seguro social, la dirección postal y la ubicación física del negocio y de los *teléfonos*, los bienes, las obras o los servicios ofrecidos, ejecuta, presta o interesa, el *informe financiero auditado, las referencias bancarias*, las referencias comerciales, el certificado de incorporación, y como una persona jurídica, el nombre y la dirección de todos los miembros de la Junta de Directores.

*Esta realidad, no contradicha, derrota el pretendido derecho a la intimidad de RDT Construction Corporation según los hechos específicos de este caso.* Desde que voluntariamente entraron al proceso de subasta, RDT Construction Corporation y el señor Tresgallo perdieron *cualquier expectativa de intimidad* que pudieran haber tenido sobre los documentos y la información de carácter personal y financiero entregados por el Banco Santander a la Oficina de la Contralor. Más aún, por disposición expresa del Art. 78 del Reglamento de Subasta, tales documentos *son públicos y, además, el destino final de esa información era la propia Oficina del Contralor.*[21]

Como explicáramos, el efecto de una citación administrativa sobre la intimidad de *una persona es mucho menor* que en un registro criminal.[22]

---

[21] El Art. 79 del Reglamento dispone que "[t]odo expediente de subasta se mantendrá en el Archivo Central Activo y *accesible, hasta la primera intervención del Contralor de Puerto Rico en éstos.*"

[22] Según expuesto, quien recibe un *sub poena* del Contralor puede acatarlo. Si no lo hace, se expone a que a través del tribunal sea obligado, bajo desacato, en cuyo

*En un contrato millonario para una obra gubernamental está sobreentendido que la entidad privada se somete y autoriza al Contralor a tener acceso a los libros, los expedientes, las cuentas y los cheques relacionados con los desembolsos de los fondos públicos.* Claro está, este consentimiento está sujeto a que los requerimientos y exámenes sean *razonables*; no se extiende a los irrazonables.([23])

La expectativa de intimidad que una corporación o *persona* posee en sus cuentas bancarias se extiende a que *el público en general* y las personas *privadas*, sin su consentimiento, puedan observar sus expedientes; pero la *intimidad nunca ha sido protegida contra los empleados del banco, y mucho menos con respecto a los agentes del Gobierno en investigaciones legítimas.*([24]) El acceso al expediente bancario está justificado por el *interés apremiante*

---

trámite puede demostrar su impertinencia. Si lo acata, esa persona es quien hace la búsqueda, en cuyo momento puede determinar que los documentos son o no pertinentes.

Distinto, en el diligenciamiento de una orden de registro judicial, un policía es quien realiza la búsqueda y, durante ésta, puede ver y leer cosas no relacionadas al objeto de la investigación.

([23]) El mencionado *Right to Financial Privacy Act of 1979*, requiere que una copia de cualquier *sub poena* federal o emplazamiento sobre récord financieros sean entregados al cliente con una notificación completa de su derecho a objetar el *sub poena* o emplazamiento en el tribunal.

Este estatuto no autoriza la supresión de evidencia *como remedio a su infracción.* Véanse: *United States v. Frazin*, 780 F.2d 1461 (9no Cir. 1986). Los tribunales, a su vez, han declinado suprimir la evidencia cuando se ha violado el estatuto en el ejercicio de su poder de supervisión. *United States v. Kington*, 801 F.2d 733 (5to Cir. 1986); *United States v. Frazin*, supra. Las limitaciones que impone el estatuto en el uso de la información no prohíbe que el Gobierno utilice los expedientes bancarios requeridos para obtener una orden de registro judicial. 12 U.S.C. sec. 3420(a); *U. St. v. Jackson*, 11 F.3d 953 (10mo Cir. 1993).

([24]) Desde *Srio. de Hacienda v. Tribl. Superior*, 81 D.P.R. 666, 675 (1960), habíamos expresado que "[l]a objeción constitucional de los contribuyentes fundada en la violación de su derecho a la protección contra registros, incautaciones y allanamientos irrazonables garantizado por la Sección 10 del Artículo II de nuestra Constitución y la Enmienda Cuarta de la Constitución Americana, *carece de méritos.* La relación entre dichos contribuyentes y el Banco Popular de Puerto Rico es una de *acreedor y deudor. Tesorero v. Banco Comercial de P.R.*, 46 D.P.R. 308 [(1934)]; *Rodríguez v. Corte*, 42 D.P.R. 766 [(1931)]. *Los libros y récords del banco son propiedad de éste.* Por lo tanto, los contribuyentes carecen de interés en la propiedad de dichos documentos y no están protegidos por las disposiciones constitucionales que invocan". (Énfasis suplido.)

Subsiguientemente, en *United States v. Miller*, 425 U.S. 435, 442–443 (1976), el Tribunal Supremo federal resolvió:

en su uso para investigaciones administrativas, procedimientos contributivos, regulatorios y criminales. Véase K.C. Davis, *Administrative Law Treatise*, 3ra ed., Minnesota, Ed. West Publishing Co., 1994, Vol. I, Sec. 4.5.

Reconocemos que los adelantos en la banca y el uso de las computadoras permiten obtener *una mayor y más rápida información*. Sin embargo, ello no significa que la información bancaria sea totalmente abarcadora en el plano íntimo. *Primero*, mucha de la información que se define como *íntima*, por su naturaleza, versa sobre datos y actividades de carácter público. Así, la "compra de un hogar", que no es otra cosa que la adquisición de un bien inmueble, cuyo exterior está a la vista. Los negocios bancarios sobre crédito hipotecario contienen las condiciones del préstamo, balance, pagos, etc. Tal información figura en la escritura *pública*, inscrita en el Registro de la Propiedad, accesible a la ciudadanía interesada.

Datos tales como la *ocupación*, la dirección y el teléfono de la persona surgen de los documentos de los trámites de *subasta y de los contratos*. Los *lugares que frecuenta, la iglesia*, las *tiendas* y los *establecimientos donde compra son actividades públicas*. En cuanto "a qué partido contribuye", basta con señalar que los partidos políticos tienen que informarlo a la Comisión Estatal, *identificando así a los contribuyentes. Segundo*, la realidad es que el cliente que lleva a cabo negocios con o mediante un banco, expone vo-

---

"... Los cheques no son comunicaciones confidenciales, sino instrumentos que han de ser usados en transacciones comerciales. Todos los documentos obtenidos, incluso los estados financieros y hojas de depósitos, *contienen sólo información voluntariamente revelada a los bancos y expuesta a sus empleados en el curso ordinario del negocio*. La ausencia de cualquier expectativa legítima de intimidad concerniente a la información contenida en los expediente del banco fue supuesto por el Congreso al promulgar el Bank Secrecy Act, con el propósito expreso de requerir que los expedientes fueran mantenidos porque éstos *poseen un alto grado de utilidad en investigaciones y procedimientos criminales, contributivos y regulatorios*." (Énfasis y traducción nuestros.)

Un año después, en *Pueblo v. Domínguez Fraguada*, 105 D.P.R. 537, 544–545 (1977), adoptamos expresamente los pronunciamientos de *United States v. Miller*, supra.

luntariamente la información y asume el riesgo de que el banco pueda revelarla al Gobierno. *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). *La Sec. 10 del Art. II de nuestra Constitución*, supra, *no prohíbe el uso de esa información por la Contralor.*

Rehusamos *alterar la naturaleza pública* de los instrumentos negociables y convertirlos en documentos privados.([25]) *Por sus características inherentes y requisitos de negociabilidad, tienen la cualidad de ser transferidos a terceros que no sean parte del contrato original.* La persona que suscribe un documento negociable no puede impedir su posterior endoso o transferencia. De ahí que no pueda reclamar confidencialidad sobre el contenido.

Al no existir un privilegio aplicable que confiera una expectativa de intimidad sobre esos documentos, no cabe impugnar su obtención por una entidad gubernamental con reconocidos *poderes constitucionales investigativos.*

El requerimiento de información hecho por la Contralor es cónsono con las facultades específicas que le han sido conferidas por la Constitución y las leyes. *Es legítima, válida y pertinente a su investigación.* En estas circunstancias, *no se infringió la expectativa a la intimidad* de RDT Construction Corporation (señor Tresgallo) sobre los docu-

---

([25]) Aún bajo el rigor de la normativa penal, un tercero, como lo es el Banco Santander, puede consentir a que esa propiedad sea registrada siempre y cuando posea una " 'autoridad común u otra relación suficiente con respecto a la propiedad a ser registrada' ". *Pueblo v. Narváez Cruz*, 121 D.P.R. 429, 437 (1988). Todo banco es parte integral en cualquier negocio que conlleve la emisión de instrumentos negociables, así como en su aceptación o pago. Los estados financieros y otros documentos en los cuales se reflejen los negocios entre el banco y sus clientes, son *expedientes del negocio del banco.* Aquí, el Banco Santander poseía suficiente "autoridad común" sobre los documentos que entregó a la Oficina de la Contralor y su consentimiento a dicho requerimiento fue válido. *United States v. Miller*, supra, págs. 440–441; *California Bankers Assn. v. Shultz*, 416 U.S. 21, 48–49 (1974).

La inmensa mayoría de los tribunales norteamericanos no han extendido la protección de la Cuarta Enmienda contra la inspección de los expedientes bancarios de los depositantes. *U.S v. Phibbs*, 999 F.2d 1053 (6to Cir. 1991); *U.S. v. Sturman*, 951 F.2d 1466 (6to Cir. 1991); *Grand Jury Proceedings: Subpoenas Duces Tecum*, 827 F.2d 301 (8vo Cir. 1987); *U.S. v. Climbing Hill Sav. Bank*, 634 F.2d 1086 (8vo Cir. 1980).

mentos entregados voluntariamente por el Banco de Santander.(26)

## VI

Conforme a *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, supra, toda empresa privada que contrata con el Estado y recibe fondos públicos está sujeta a ser investigada por la Oficina de la Contralor. En el descargo de sus poderes investigativos constitucionales, dicha funcionaria está obli-

---

(26) Hemos visto que la Constitución *no exige* a la Contralor que, al emitir citaciones administrativas para requerir documentos bancarios, obtenga una orden judicial.

Ni nuestra Constitución ni la Sec. 10 de nuestra Carta de Derechos, *supra*, establecen una prohibición *absoluta* contra un registro sin una orden judicial. La Sec. 10 contiene dos (2) cláusulas independientes; cada una veda un tipo de acción gubernamental diferente. La *primera* cláusula reconoce el derecho del pueblo a estar libre de registros "irrazonables"; la *segunda* prohíbe que se emita una orden judicial que no satisfaga el requisito de *causa probable*. En el caso de autos, la controversia central gira en torno a si una citación administrativa del Contralor, *autorizada por la Constitución sin una previa orden judicial*, es *irrazonable* per se, dentro del significado de la primera cláusula. Obviamente la respuesta es en la negativa.

No podría ser de otro modo. Aun en el ámbito de una investigación de actividad criminal, este Tribunal ha resuelto que la *razonabilidad* del registro dependerá de si fue llevado a cabo en conformidad con una orden judicial válida. *Pueblo v. Narváez Cruz*, supra; *Pueblo v. Malavé González*, 120 D.P.R. 470 (1988); *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986); *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979); *Pueblo v. González Rivera*, 100 D.P.R. 651 (1972). *Sin embargo, hay una categoría de registros que son razonables, dentro del significado de esta primera cláusula, a pesar de que no existió una orden judicial previa al registro. Pueblo v. Narváez Cruz*, supra; *Pueblo v. Zayas Fernández*, 120 D.P.R. 158 (1987); *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139 (1985); *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770 (1982); *Pueblo v. Nieves Vargas*, 101 D.P.R. 263 (1973); *Pueblo v. De Jesús Robles*, 92 D.P.R. 345 (1965).

El requisito de una *orden judicial* previa al registro está unido al concepto de *causa probable* de la segunda cláusula de la Sec. 10 de nuestra Carta de Derechos, *supra*. Como explicáramos, las auditorías *rutinarias* que realiza la Contralor, no están necesariamente fundamentadas en la *sospecha* de que la entidad investigada ha cometido alguna irregularidad. Es ilógico e improcedente exigirle *causa probable*. Según esa tesis, si sus *sub poenas* son evaluados a base de los requisitos de *causa probable* de la segunda cláusula de la Sec. 10, *éstas serían automáticamente irrazonables*.

*La necesidad administrativa de adquirir información para poder ejercer sus deberes de reglamentación de forma efectiva, hacen imperioso que la Contralor pueda realizar investigaciones sin tener que demostrar que ha ocurrido una violación a la ley*.

gada a respetar los derechos constitucionales de las personas investigadas, en especial de tan alta jerarquía en nuestro ordenamiento como lo es el *derecho a la intimidad.* Ahora bien, aunque de la más profunda envergadura, su vigencia depende del control que la persona haya mantenido. Quien brinde a otro información "privada" sabe que ya ha perdido ese carácter, máxime en el ámbito de *los negocios* que se hacen con el Gobierno mediante subastas públicas, en que la información queda vertida, la mayoría de las veces, en *documentos, incluso instrumentos negociables que, por definición, fueron hechos para pasar de persona a persona.*

En el descubrimiento de la corrupción y el mal uso de los fondos públicos, para fijar responsabilidades, ni RDT Construction Corporation ni su Presidente, señor Tresgallo, tienen suficiente expectativa de intimidad como para impedir la inspección de documentos bancarios en situaciones de interés gubernamental apremiante.

Finalmente, no pueden invocar la tesis judicial de *factura más ancha* del derecho a la intimidad bajo nuestra Constitución. *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975). La aplicación *ciega y mecanicista* de esa tesis en este caso, como precedente, convertiría la *factura más ancha* en la *factura más costosa* jamás pagada por el Pueblo de Puerto Rico.